LEE MOREHEAD, APPELLANT, v. O. G. GRIGSBY AND SHANNON BROTHERS LUMBER COMPANY, RESPONDENT.—132 S. W. (2d) 237.

Springfield Court of Appeals. August 10, 1939.

*George B. Bridges* for appellant.

*Oliver & Oliver* for respondents.

FULBRIGHT, J.—This cause was instituted before the Workmen's Compensation Commission, October 11, 1937, by Lee Morehead against O. G. Grigsby and Shannon Brothers Lumber Company (Shannon Brothers Incorporated), and is based upon an injury to the left hand while employee was sawing blocks. The Referee and the full Commission found for claimant, and Shannon Brothers Incorporated and its insurer appealed to the circuit court where the award of the Commission as to them was reversed and as to O. G. Grigsby affirmed. Claimant then appealed to this court.

Shannon Brothers Incorporated is engaged in the wholesale hardwood lumber business with its principal place of business in Memphis,

Tennessee. The company has been in business since 1919, and until 1933 or 1934 its usual operation consisted of buying virgin timber, cutting and hauling the logs by rail or river to Memphis where they were put through the company's mill, put into lumber, dried and sold on the market. In two instances since 1933 or 1934 the company has purchased the land upon which the timber stood. The first tract so purchased was at Hughes, Arkansas, and the second, a six or seven hundred acre tract, in Mississippi County, Missouri. The suitable timber on the Arkansas tract was disposed of and a contract let to clear the cut over land and put it in condition for farming purposes in order that the company might realize additional profits. The timber had been removed from approximately 150 to 200 acres on the Missouri tract prior to the month of June, 1937, at which time, Shannon Brothers Incorporated entered into a contract with O. G. Grigsby to clear this cut over portion. Part of the culled hickory logs that was left on this tract was sold prior to the contract with Mr. Grigsby. There was an agreement between the company and Mr. Grigsby whereby the culled hickory logs and other timber suitable for the purpose manufactured into billets which were to be hauled to Cairo, Illinois, and disposed of, and the company was to receive one-fifth of all they sold for. Subsequent to this agreement a mill was placed on the tract for the purpose of sawing the timber into billets or squares. Mr. Grigsby secured the services of Lee Morehead to operate this mill, and it was while he was working at the mill sawing billets that he received the injury complained of herein.

Respondents insist ''that there was not sufficient evidence on which to base an award to the effect that the work in which Lee Morehead was engaged was work done under contract in the usual course of business of Shannon Brothers Incorporated.'' That they limited the issues to this sole question appears from their statement, as follows:

''The circuit court agreed with respondents holding that the uncontroverted facts showed that the work being done was not in the usual course of business of Shannon Brothers Incorporated. This therefore is the only question in the case.''

A portion of the Referee's finding of fact and ruling of law in connection with the hearing of said cause is as follows: ''I find, from the evidence that, while the primary business of the Shannon Brothers Incorporated was the cutting and selling of hardwood timber, it was also a part of their regular business to clear and develop such land as they acquired for the timber it would produce, to their financial advantage and further that O. G. Grigsby, co-defendant in this case, was engaged in clearing a tract of land owned by the Shannon Brothers Incorporated, on or about August 12, 1937 and had set up a saw mill on the premises to be cleared and had engaged the claimant in this cause as a foreman. There is no evidence that title of the land, or the cull lumber thereon passed from the Shannon Brothers Incorporated,

but to the contrary. The Shannon Brothers Incorporated were to share in the profits of the sale of manufactured 'Billets' upon the completion of sale and further that the Shannon Brothers were vested with authority to stop any and all operations upon these premises at their will.''

The full Commission found, in part, ''That the employee was employed by O. G. Grigsby, and that said Grigsby was a major employer subject to the provisions of the Missouri Workmen's Compensation Law. We further find said Grigsby was an independent contractor doing work on the premises of Shannon Brothers Lumber Company, and that the work being done was a part of the usual business of said lumber company. Therefore, Grigsby is primarily liable for the compensation awarded herein and the Shannon Brothers Lumber Company and their insurer are secondarily liable.''

The circuit court found, in part, ''that plaintiff Lee Morehead and defendant O. G. Grigsby were independent contractors but that the work in which they were engaged in the cutting of squares from the cull hickory timber was not a part of the usual business of the said Shannon Brothers Lumber Company.''

It is conceded by both parties that claimant must recover, if at all, under section 3308a, Revised Statutes of Missouri, 1929, on the theory that Lee Morehead was an employee of an independent contractor (Grigsby) who was engaged in the usual business of Shannon Brothers Incorporated.

The evidence pertaining to this issue is, in substance as follows. J. E. Shannon, president and general manager of Shannon Brothers Incorporated, testified that ''Shannon Brothers Incorporated is engaged in the manufacture of wholesale hardwood lumber. The manufacture of wholesale hardwood lumber consists of buying the timber, either contract the logs cut and hauled to the railroad or river, but we do this ourselves, have our own equipment and haul them to the river and barge them down to Memphis and put them throught the mill. . . . I have never run a handle mill or a dimension mill. That is not a part of the usual business of a lumber company such as I have.'' He further testified that Mr. Beaton (the company's superintendent in Mississippi County) sold one of the cull timber on the tract involved to a man at East Prairie, and ''then two or three weeks after that or a month, Mr. Grigsby got after me to buy them and I asked him what he would give.

''Q. Got after you to buy what? A. The cull hickory logs and I asked him what he'd give for them and he said it is hard to tell, but there was a lot of good billets and maybe there would be four inches of good wood around the edge. He said, 'I will split them in billets and haul them to Cairo and give you one-fifth of what I get for the billets for stumpage.' And I said, 'Go ahead, I have never sold anything like that, but I will ty it.' And he split them for about three

or four weeks, I had to come back about every week or two weeks and some time after that I come over there and I saw this mill he had setting up there and he said, 'I got me a saw mill. What do you think about it?' And I said, 'Well I don't know.'

"The contract for these billets was separate and apart from the clearing agreement and was a verbal contract. The manufacture of billets is not a part of our usual lumber business, it is the first time I ever sold any like that. Two or three years ago was the first time I cleared some land and I had been in business since 1919. This will be the second time I have cleared land. I cleared some in 1933 or 1934 in Hughes, Arkansas. That is not separate and apart from the lumber business but is connected with the lumber business and owned by the lumber business.

"Q. Did you say it was owned by the lumber business? A. Yes, sir.

"Q. But that is not connected with the lumber business; that is separate and apart, isn't it, Mr. Shannon? A. Yes, sir. It is owned by the lumber business.

"Q. Did you say it was owned by the lumber business? A. Yes, sir.

"Q. You mean the land was owned by the lumber company? A. Yes, sir. . . .

"Q. Had you ceased all of your timber operations on that land when you entered into your agreement with Mr. Grigsby about selling him these billets? A. On approximately 150 to 200 acres we cut it all off except a few hickory trees and they run so bad, I told them if there was any good trees, I wanted them but if not he could put them in his billets.

"Q. Do you consider your operations cutting off the good timber? A.. I have cut all the timber I ever expect to cut and remove.

"Q. And in your opinion, you have cut off all the timber that is merchantable? A. What I call merchantable.

"Q. And yet you make a contract with Mr. Grigsby for one-fifth? A. What was left."

Mr. Grigsby testified that some time in June, 1937, he entered into an agreement with Mr. Shannon to clear the land for $12 an acre; that there was nothing said the first time he talked with Mr. Shannon about what was to be done with the timber; that later on he talked to Mr. Shannon and told him there was some hickory on the land and asked him what he would do about it; that he said to Mr. Shannon, "I will give you one-fifth of what I can get out of it," and Mr. Shannon said, "Well you go ahead and try it that way and if I could do it any good, if I was getting too much out of it he'd see me later. He didn't know what I'd do with it and I didn't either." He testified that after he had gone to making billets he saw Lee Morehead who told him that he was a bolting saw man and could make the squares with a saw mill and make some money down on that job where the clearing was being done; that the timber was cut and logs or blocks hauled to the

mill; that "Lee was to get either two-fifths or by the day. He said if he worked by the day and worked all the time he wanted as much as $4.00;" that he had made no decision as to whether he would pay Morehead by the day or give him two-fifths at the time of the accident; that he had the choice to do either; that the billets or squares were delivered at Cairo, Illinois, where they were sold; that he got two-fifths, Shannon Brothers one-fifth, and Morehead two-fifths from these transactions in Cairo.

He further testified that he never saw Mr. Waters (foreman for Shannon Brothers) on the premises, and never saw Mr. Beaton there but once; that Lee (claimant) and he (Benton) "built a mill shed for the tractor out of brush. They put up some poles and made a shade. The sun was hot. They got the stuff to make the mill shed from over where Shannon Brothers was building the houses. It was just old cull stuff. I didn't tell them to go over and get it. They went over and got it on their own hook."

M. D. Beaton testified, in part, as follows: "I am employed by Shannon Brothers and am superintendent of this job here. Shannon Brothers at this time are engaged in the business of logging in Mississippi County, Logging—cutting and hauling to the river. We had finished logging on about two or three hundred acres north of Bennett's. . . . I am in charge of all operations of Shannon Brothers in Missouri. I had finished my operations on the land that Mr. Grigsby had a contract to clear.

"Q. I will ask you whether or not making billets is a part of the manufacture of hardwood lumber? A. No, sir, not in the lumber operations, no sir.

"Q. Is it connected in any way with the manufacture of hardwood lumber? A. No, sir, not by a saw mill manufacturing hardwood lumber, does not make squares and things like that. Shannon Brothers didn't handle squares in any way. Not even to buy them on the outside and sell them."

He further testified that they had ceased taking the timber that was wanted for Memphis; that cull timber was finally sold to Mr. Grigsby; that it was his knowledge that Mr. Shannon was to receive one-fifth of the proceeds of the finished products that were delivered in Cairo; that usually when he had cut off the timber that was wanted for Memphis the rest was sold, some of it for blocks at times, some time it went back to the owner of the land; that Shannon Brothers bought timber only; that they did not want the land here or at Hughes, but were forced to take the land to get the timber and during the depression cleared it to get the money out of it; that he had nothing to do with the work in which Grigsby was engaged and no supervision over it.

Lee Morehead, the claimant, testified that he was employed by Mr. Grigsby and went to work about August 2, 1937, received the injury

to his hand August 12, 1937 while operating a dimension mill on the premises of Shannon Brothers Incorporated; that he knew Mr. Beaton and Mr. Waters, representatives of Shannon Brothers; that Mr. Beaton was there when he was putting up the line shaft of this mill and Mr. Beaton told him that he would put up more posts to make the line shaft more solid, which he did; that "Mr. Waters told me about the saw not running fast enough, ought to put more speed on the saw, and Mr. Beaton told me to cut the ash block, if he was me he'd cut the ash block in two and a half and two inch stuff.

"Q. Did you follow their instructions? A. I followed Mr. Beaton's but I had the governor on the tractor running as fast as it would run—

"The Referee: At this point I want something for my own information. Did you follow their instructions or suggestions? A. Well, I done as near as I could."

He further testified that he thought Mr. Beaton and Mr. Waters were there nearly every day looking around at the stuff and examing it; that the lumber used in the mill shed came from "across the road there from where Shannon Brothers were building houses. I have set up mills like this before this one. You can't use scrap lumber in setting a mill." He testified that Grigsby paid him $3.00 a day setting the mill, and $4.00 a day for sawing until the day his hand was cut; that after then for about three weeks they operated under the two-fifths agreement.

C. H. Grimes testified that he was head sawyer at a mill owned by Red Grigsby located on Shannon Brothers' land after Morehead's hand was cut off; that he knew Mr. Beaton, saw him on the premises where he was working talking to the rip saw man; that to his knowledge Mr. Beaton showed the rip sawyer how to operate his saw.

A great diversity of opinion appears in the decisions of the courts of the various states construing the phrase similar to "the usual course of his business" as used in section 3308a of our compensation act, and it may be said that no general rule is deducible from the authorities. It is often a matter of extreme difficulty to decide whether the work in a given case falls within the designation of the statute. The provisions of the compensation act are to be liberally construed to effectuate its purpose, and not unnecessarily restricted by technical construction. [Section 3374, R. S. Mo., 1929; Drecksmith v. Universal Carloading & Distributing Co., 18 S. W. (2d) 86; Elsas v. Montgomery Elevator Company, 50 S. W. (2d) 130; Pruitt v. Harker, 43 S. W. (2d) 769.] Our Supreme Court in the case of McFall v. Barton-Mansfield Co., 61 S. W. (2d) 911, quoted with approval from the case of Eddington v. Northwestern Bell Telephone Co., 201 Iowa, 67, 202 N. W. 374, as follows: "The clear objective of the Compensation Act is to protect the employee against the hazards of the employer's trade or business. When the relation of employer and employee is established, and when the employee is subjected to the hazards of his em-

ployer's trade or business, and suffers injury therefrom while so engaged, in the due course of his employment, the excepting proviso of the statute ought not to be enlarged by difficult or doubtful construction so as to render such an injury noncompensable.''

It is no longer open to question but that under section 3308a of our Act any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on, is to be regarded as a statutory employer of such contractor, and as such liable to him for compensation for an injury received by him on or about employer's premises while doing work which was in the usual course of the employer's business. But if an injury is received by one employed by an independent contractor in work that is not a part of the operation of the employer's usual course of business, and is only incidental, ancillary, or auxillary thereto, case for compensation is not presented. [Cummings v. Union Quarry & Construction Co., 87 S. W. (2d) 1039; Pitts v. Maupin, 88 S. W. (2d) 384.]

The line of demarcation between liability and nonliability under the facts in the instant case is closely drawn. The business of Shannon Brothers Incorporated grows out of the timber industry. Since 1919 it has been engaged in the manufacture of hardwood lumber. While its primary purpose and business is limited to the purchase of standing timber, cutting and conveying it to its mill in Memphis, there to be converted into lumber, it appears that when it becomes necessary to acquire title to land in order to get the timber it does so, and thus acquiring land for the timber thereon is done in its usual course of business. That it never purchased land with the growing timber prior to 1933 or 1934 does not change the situation. The fact remains that it did buy land in order to effectuate and promote its usual business. After the timber fit to be run through its mill at Memphis has been removed from land thus acquired, contracts are let for clearing, and logs and other timber remaining unsuitable for the Memphis mill are sold or manufactured into billets or squares in order that greater pecuniary benefit may be derived.

In the present case, after the most desirable timber had been removed from 150 to 200 acres of its land in Mississippi County, a contract was let to O. G. Grigsby to clear that portion. Some of the culled logs were sold, and an agreement was entered into between Shannon Brothers and Grigsby whereby the remainder of the culled logs and other suitable timber be made into billets or squares, Shannon Brothers to receive one-fifth of the sale of the finished products at Cairo, Illinois. Shortly after work began a small mill was placed upon the land by Grigsby to be used in the manufacture of the timber. Claimant was employed to operate the mill. It is obvious that these transactions grew out of its usual business and were for the purpose of augmenting the financial returns and promoting the successful operation of the

normal and regular business of Shannon Brothers Incorporated, and it is immaterial whether it was engaged in such business for a brief or considerable length of time. Every case of this character rests upon its own particular facts and while the following are not authority for our holding in the instant case, and may be readily distinguished therefrom, they are at least persuasive. [McFall v. Barton-Mansfield Co., *supra*; March v. Bernardin, 76 S. W. (2d) 706; Thompson v. Twiss (Conn.), L. R. A. 1916-E 506; Skillman v. Industrial Accident Comm. (Cal.), 21 Pac. (2d) 658; Fox v. Fafnir Bearing Co. (Conn.), 139 Atl. 778; Carlson v. Miller (Conn.), 172 Atl. 872; Wisinger v. White Oil Corp., 24 F. (2d) 101; Willard v. Bancroft Realty Co. (Mass.), 159 N. E. 511; Hollingsworth v. Crossett Lumber Co. (La.), 165 So. 311; Heineman Lumber Co. v. Industrial Commission (Wis.), 276 N. W. 343; Hill's Case (Mass.), 167 N. E. 914.]

It is true, the question involved is a close one. The evidence is conflicting, and a contrary finding of the Commission could not have been disturbed. Yet, we find nothing as a matter of law that compels a finding either way. Most of the witnesses were hostile to claimant and their testimony is conflicting. In passing on the question before us it is our duty to accept all favorable evidence, and reasonable inferences that may be drawn therefrom, in support of the award. The finding of the Commission has the force and effect of the verdict of a jury and if supported by competent and substantial evidence, it should not be disturbed. Following these well established and frequently announced rules, it is our conclusion that the judgment of the circuit court should be reversed and the cause remanded with direction that judgment be entered in accordance with the Commission's award. It is so ordered. *Smith, J.,* concurs; *Allen, P. J.,* absent.