**ATLAS POWDER CO. v. HANSON.**

No. 12473.

Circuit Court of Appeals, Eighth Circuit.

June 21, 1943.

Haywood Scott, of Joplin, Mo. (Thomas J. Laffey, Jr., of Wilmington, Del., Leslie A. Welch and Richard H. Beeson, both of Kansas City, Mo., and John W. Scott, of Joplin, Mo., on the brief), for appellant.

Lloyd R. Fraker, of Kansas City, Mo. (Brennan & Fraker and Redmond S. Bren-nan, all of Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

The plaintiff recovered judgment for $5,-000 in an action for damages for negligence resulting in personal injuries sustained by him on October 24, 1940, while working as a steamfitter at defendant's plant at Atlas, near Joplin, Missouri. The case was removed from the State to the Federal court for diversity of citizenship and trial there was to the court without a jury. The defendant has appealed.

■ The sole controversy here is presented by defendant's contention that under the circumstances of plaintiff's employment at the time of his injury the defendant was his "statutory employer" within the meaning of the Missouri Workmen's Compensation law, and that plaintiff was therefore limited to the rights of recovery provided by that law and had no common law action for damages against defendant. It is conceded that Missouri law, as found in its statutes and decisions, is controlling, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; West v. American Tel. & Tel. Co., 311 U. S. 223, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L. R. 956, and that the Missouri Workmen's Compensation law is substitutional in character, New Amsterdam Casualty Co. v. Boaz-Kiel Constr. Co., 8 Cir., 115 F.2d 950, and cases cited. If defendant was plaintiff's employer, either immediate or remote, within the meaning of the Missouri Act at the time of this accident, plaintiff can not sustain the recovery of common law damages awarded him.

Section 3698, Rev.St.Mo.1939, Mo.R.S.A. § 3698, included in the Missouri Workmen's Compensation law, provides:

"§ 3698. Who deemed an 'employer'—applicable to 'landlord and tenant,' 'lessor and lessee'—exception, when

"(a) Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business. * * *

"(c) The provisions of this section shall not apply to the owner of premises upon which improvements are being erected, demolished, altered or repaired by an independent contractor but such independent contractor shall be deemed to be the employer of the employees of his subcontractors and their subcontractors when employed on or about the premises where the principal contractor is doing work."

It is undisputed here that the defendant was "a person having work done under contract on his premises" and that the plaintiff was employed in such work when injured, and the plaintiff's position is that the defendant's plant where he was then working should be deemed to be "premises upon which improvements were being erected by an independent contractor" as plaintiff's only statutory employer within the intendment of subsection (c), and that the work upon which plaintiff was engaged was not "an operation of the usual business" carried on by defendant at its plant within the meaning of subsection (a).

The defendant insists that the work which it was having done at its plant in which plaintiff was participating when injured was an operation of its usual business there carried on and that it was not with respect to plaintiff "the owner of premises upon which improvements are being erected, demolished, altered or repaired by an independent contractor" within the meaning of the special exception to the Act provided by subsection (c).

The facts concerning plaintiff's employment are not in dispute and are shown by written stipulation of the parties and by the testimony of defendant's plant managers and engineers.

It appears that defendant was, and for many years had been, engaged in the manufacture of explosives at its several large plants, including its plant at Atlas, near Joplin, which is located upon an area of some two thousand acres, including various structures spaced at some distance from each other for safety and connected by light and power lines, conduits and several kinds of piping carrying liquid sulphuric and other acids, steam and gases. The Atlas plant was originally constructed in 1913. In 1917 the company set up an engineering department as a division of its operating department to design, lay out and construct additions, expansions and new plants (among other things), and during the ten year period succeeding 1932 the company had done a great deal of work of construction and expansion at its Atlas plant, including the rebuilding of a sulphuric acid producing plant which consists of probably ten large tanks, six, eight and ten feet in diameter, twenty or thirty feet long, with all connecting pipes, pumps and all of the outside connecting lines to various portions of the acid plant. It piped natural gas through the plant to the nitric acid house, to the drum concentrators, to the seven houses in the village; piped up all of that work, some of it underground and a lot of it above ground, regulators, burners, combustion equipment. It had a fire that destroyed the entire acid mixing plant, the most essential portion of the entire acid area, and that was rebuilt by the Atlas company itself with its own organization. The work was done in the usual course of business by the company's regular permanent employees. At the same time similar work was carried on by defendant at its other plants in the same way, through its regular employees. In 1939 the company, in order to take care of business "that developed due to the general world condition that was developing into war", expanded its plant at Atlas by adding what is referred to as a T N T line or unit, requiring, among other things, extensive installation of pipe lines. Later in 1939, and in 1940, in order to supply the British government with T N T under contract, the T N T unit was further expanded by the addition of what is referred to as second and third T N T lines located right beside the first, parallel to it and practically duplications of the first. Plaintiff was injured while working on pipes directly connected with the third unit.

Although it might have been possible to design and specify such work with sufficient accuracy and precision to permit its being let out to contractors, that was not the company's policy. It at all times designed, blueprinted and specified the work and maintained supervision and direction and had all the work done by its regular organization, with few exceptions.

Defendant produces and processes most of the elements used in its manufacture of explosives at the Atlas plant, and providing and maintaining means for transportation from place to place of the currents, steam, gases and liquids so used is an important part of the work there carried on. Liquid sulphuric acid is so conveyed through miles of pipes interconnected

throughout the area and mostly carried above ground on poles with hangers.

The installations of additional large amounts of such piping required in connection with the addition of the third T N T line necessitated the employment of more steamfitters than the company had available for the purpose in its regular organization, and on April 3, 1940, defendant contracted with the Benjamin F. Shaw Company, a corporation, to furnish all labor and tools, "including welder's outfit", necessary to erect and install piping in connection with designated work at the Atlas plant, agreeing to pay Shaw's "men on the job" at specified "labor rates", the rate for "fitters" being $1.21 per hour subject to adjustment "if necessary." To the specific labor rates 3½ per cent was added "for compensation and public liability insurance", which was carried by the Shaw Company.

It was pursuant to this contract that the defendant obtained the services of the steamfitters or "fitters", including the plaintiff, required for the overhead pipe installation in question at the third T N T unit. Though there was considerable turnover on the work, the question of discharging men seldom came up. They were union men, and in certain instances the defendant and the union agent made suggestions to the Shaw company which were complied with. Shaw could hire and fire. The defendant erected the necessary scaffolds and the poles and hangers and supplied all materials. It interpreted the plans to Shaw's men on the work, supervised the work as it went along and directed changes or corrections; and particularly as to disconnections and connections at existing installations, defendant's steamfitters, familiar with the dangers of the escape of acids, steam and gases, did that work themselves. The total amount paid to the Shaw company under the contract, at the labor rates agreed upon, was $135,080.12, and defendant's own men, skilled and unskilled, were paid $297,648.78 on the same work. The total cost of the work was $1,498,473.44. Plaintiff's accident occurred while he was up on a scaffold on which there were two forty-foot lengths of pipe intended to be attached to the hangers on the poles erected by defendant. He was helping to measure the distance from a nearby tank to a point above the scaffold and during the work a post hole was dug too close to the scaffold, permitting one leg of it to settle down. The resulting movement and tilt of the scaffold caused plaintiff to be struck by one of the pipes and to be injured. He claimed, and was awarded and paid compensation under the Act for his injury.

We think it is clear on the facts presented that the work of pipe fitting which defendant was having done on its premises and which plaintiff was doing at the time of his injury, was "work * * * which was an operation of the usual business which defendant there carried on", both within the plain wording of subsection (a), supra, and its true intent as explained by the Missouri courts, who have had frequent occasion to consider and apply it. The liquid acids continuously carried in pipes, and used by defendant in its usual business, were destructive of the materials of which the pipes were composed, and the installation, alteration, maintenance and all such work as is included in "pipe fitting" was constantly carried on by its regular employees belonging to the same craft as plaintiff, not only at Atlas, but at all its plants. Such pipe fitting work was an essential part of plant operation.

In Wors v. Tarlton, 234 Mo.App. 1173, 95 S.W.2d 1199, loc. cit. 1206, the court pointed out that "the prime purpose of section 3308 [3698 supra] is to prevent the owner of the premises upon which he is having work done of the usual character of work which he there carries on from circumventing the act and escaping all liability either under the act or at common law by the fiction of contracting independently for the work with persons without financial responsibility" (Gholson v. Scott, Mo.App., 130 S.W.2d 216, loc. cit. 219, to the same effect), and it would be hard to imagine work more integral to any manufacturing operation than pipe fitting is shown to be in defendant's production and transmission of liquid acids in its manufacture of explosives. We find no Missouri decision to justify an interpretation of the State's compensation act which would exclude the pipe fitting work at the Atlas plant in this case from the description in subsection (a), of "work * * * which was an operation of the business which defendant there carried on." If the controversy here depended upon the application of subsection (a) alone to the undisputed facts, the conclusion that the relationship of statutory employer and employee existed between the parties at the time of accident would appear too clear for argument.

It is argued for plaintiff that Cummings v. Union Quarry & Construction Co., 231 Mo.App. 1224, 87 S.W.2d. 1039, 1041, and Rucker v. Blanke Baer Extract & Preserving Company, Mo.App., 162 S.W.2d 345, are to the contrary, but we do not think so. The work which the plaintiff was doing at the time of his injury in the first of those cases was characterized by the court as "only incidental, ancillary, or auxiliary", and was work of such a kind that the employer "had no regular employee for such task, but instead regarded the same as a specialty job." In the second case, the work at which the plaintiff was injured was that of a steeplejack painting smokestacks at defendant's canning factory, and the court held that such a specialty task constituted no part of defendant's business within the statute.

■ But plaintiff's reliance on subsection (c) requires that it also be considered in·connection with the facts of this case. As that subsection provides a special exception to the definition of employer in subsection (a), Bobbitt v. Ehlers, Mo.App., 131 S.W.2d 900, it must be strictly construed so as not to defeat the general intent and purpose of the Act declared in subsection (a), but must be read consistently therewith, Bunner v. Patti, 343 Mo. 274, 121 S.W.2d 153, loc. cit. 156. Although the words of subsection (c) cover "improvements being erected, demolished, altered or repaired by an independent contractor", no meaning should be ascribed to "improvements" which would permit the owner of premises to "circumvent the act" by identifying the work he does on his premises in the usual course of his business with the erection, demolition, alteration or repair of improvements referred to in the exception provision, subsection (c).

■ It may be said in a certain sense that all of the miles of pipe lines. on defendant's premises are "improvements" thereon, and that whenever its pipes are eaten out by the acids and are replaced in the usual course of business, or whenever an increase in the volume of acids produced requires more pipes to carry it, that "improvements are demolished, altered, repaired or erected", but plainly subsection (c) permits of no such interpretation here. Subsection (c) is intended to apply to a situation where a property owner procures an independent contractor to build him a house or such like improvement, to tear one

down or make alterations or repairs upon one. In such a situation there is a reason why one who is merely the owner of premises upon which he may in many cases not even enter should not be made an employer in any sense of the workmen on the job, but should merely be required, as elsewhere stated in the Act, to see to it that the independent contractor carries insurance for them. Of course the "improvement" is not limited to a house, Allen v. Jackson County Savings & Loan Association, 232 Mo.App. 1098, 115 S.W.2d 7, and there will be instances where the dividing line between the "improvement" of subsection (c) and the "work which is in the usual course of [the owner's] business" of subsection (a) may be hard to draw. "It is often a matter of extreme difficulty to decide whether the work in a given case falls within the designation of the statute". Morehead v. Grigsby, 234 Mo.App. 426, 132 S.W.2d 237, 240. But such difficulty is not present here. Though the defendant had contracted with the Shaw company, its contract extended only to supply additional workmen needed to expand facilities to increase the volume of production in the war urgency and although the company became, in certain narrow and limited respects, an independent contractor, it was only to supply additional workmen of the same craft as defendant's own workers to do the same kind of work. The Atlas plant was in no fair sense brought within the description to which subsection (c) is restricted, "premises upon which improvements are being erected, demolished, altered or repaired by an independent contractor."

We think this conclusion follows the view taken of subsections (a) and (c) by the Missouri courts. The Missouri decisions rested directly on subsection (c) seem to confirm our conclusions here.

In Kennedy v. J. D. Carson Co., Mo.App., 149 S.W.2d 424, 428, the court quoted, as expressing its own views, a declaration of the Supreme Court of Utah, Utah Copper Co. v. Industrial Commission, 57 Utah 118, 193 P. 24, 13 A.L.R. 1367, as follows: "The intent of the legislation in question was to create a new or additional burden upon the industries of this state not heretofore borne by such industries, and to establish a system whereby the industries should bear the cost of providing for those injured while engaged in such industries * * *. Such being the object sought, it is, in our judgment, more in consonance

with that purpose to conclude that it was not the intention of the Legislature to exclude from the operation of the act any one engaged in work necessarily required in the usual prosecution of such industries, and that the duration of such employment or the infrequency of the same ought not to control the courts in determining whether the employment was casual or otherwise. If the employment was essential and was required in the prosecution of the regular business of the industry, the industry, in order to carry out and effectuate the purpose of the act, should pay for any injuries sustained." The same opinion cites the following Missouri opinions dealing with the application of the subsections under consideration to particular facts presented: McFall v. Barton-Mansfield Co., 333 Mo. 110, 61 S.W.2d 911; Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769; State ex rel. Superior Mineral Co. v. Hostetter et al., 337 Mo. 78, 85 S.W.2d 743, approving Woodruff v. Superior Mineral Co., 230 Mo. App. 616, 70 S.W.2d 1104; Cates v. Williamson et al., Mo.App., 117 S.W.2d 655; Carrigan v. Western Radio Co. et al., 226 Mo.App. 468, 44 S.W.2d 245; Sonnenberg v. Berg's Market, 227 Mo.App. 391, 55 S.W.2d 494.

Bobbitt v. Ehlers, supra, is illustrative of the circumstances under which subsection (c) is applicable. There the owners of the premises in question were engaged in the erection of a building for residential purposes. The brickwork was let to an independent contractor and one of his bricklayers who was injured on the job sought compensation from the owners under the Act. The court pointed out that although "in subsection (c) there is an exception noted to the liability created by subsection (a), the work being done consisted of the erection of an improvement (the house) upon the premises by an independent contractor" and therefore "the character of the work was such as to bring [it] squarely within the provisions of Subsection (c) * * * and not under Subsection (a)." [131 S.W.2d 901.] The owners of the premises were causing the house to be erected for the purpose of sale and at the same time had let out the erection of other houses for the same purpose. But they were doing none of the construction work themselves and were not employers of the injured workman within the Act. See also Gholson v. Scott, Mo.App., 130 S.W.2d 216.

We think that upon the uncontroverted facts the trial court was in error in its finding and conclusion that the work being done on defendant's premises in which plaintiff was injured constituted "improvements being erected by an independent contractor and was not an operation of the usual business which defendant there carried on and that the Missouri Workmen's Compensation Act was not applicable." We hold that there was no substantial evidence to sustain the judgment, and it is therefore reversed with directions to dismiss.