Roger WARD, Respondent,

v.

Albert CURRY, Defendant,

Standard Accident Insurance Company, Garnishee, Appellant.

No. 47862.

Supreme Court of Missouri, Division No. 1.

Dec. 12, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 9, 1961.

John J. Alder, Wiley W. Morrison, William Bryan Miller, Alder & Morrison, Kansas City, for garnishee, appellant.

Irving Kuraner, Kansas City, for respondent. Kuraner, Freeman, Kuraner, Oberlander & Lamkin, Kansas City, of counsel.

HOLLINGSWORTH, Judge.

Garnishment. Plaintiff, Roger Ward, who has judgment for the sum of $37,500 against Albert Curry for personal injuries negligently inflicted upon him by Curry in the operation of a motor truck owned by Stewart Sand & Material Company, caused Standard Accident Insurance Company (hereinafter referred to as "Standard") to be summoned and impleaded as garnishee in aid of an execution issued on said judgment. The issue presented in that proceeding was whether a certain policy of liability insurance issued by Standard to its named insured, Stewart Sand & Ma-

terial Company (hereinafter referred to as "Stewart"), also covered Curry's liability to Ward under the aforesaid judgment. With jury trial waived, the trial court found in favor of plaintiff Ward and rendered judgment against Standard for $37,-500 and for interest and costs, from which Standard has appealed.

The policy of insurance, designated as a "Comprehensive Liability Policy", issued by Standard to Stewart and outstanding on the date plaintiff was injured by defendant Curry, to wit: November 10, 1955, contained the following provisions material to adjudication of the issues presented to the trial court and in the briefs filed in this court:

"Insuring Agreements

"I. Coverage A—Bodily Injury Liability. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person and caused by accident.

\* \* \* \* \* \*

"III. Definition of Insured. The unqualified word 'insured' includes the named insured and also includes * * (2) under Coverages A and B, any person while using an owned automobile * * * and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, * * *. *The insurance with respect to any person or organization other than the named insured does not apply under Division (2) of this Insuring Agreement:*

\* \* \* \* \* \*

*"(c) to any employee with respect to injury to * * * another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of an automobile in the business*

*of such employer."* (Emphasis supplied.)

Stewart is and for many years has been engaged in the business of (1) dredging sand from the Missouri River, piling it on the river bank, and selling and delivering it to its business customers in and adjacent to Kansas City and (2) making ready-mixed concrete, which it also sells and delivers to its customers in that area. In the process of making concrete, it also hauls rock, gravel and other material from its sources of supply to the plant where it is mixed. The various phases of its operations are conducted from several plants, but the premises primarily involved in this proceeding are at First and Grand Avenue in Kansas City, Missouri. These premises, about 600 by 300 feet in dimension, lie along the south side of the Missouri River. The mixer plant used in making ready-mixed concrete is situated in the center thereof.

Delivery of ready-mixed concrete, which goes from Stewart's plant to its numerous customers, is made by means of some 90 specially constructed "ready-mixer" motor trucks owned by Stewart and operated by Stewart's regular employees, *one of whom was the defendant Curry.* Delivery of sand to Stewart's customers and of sand, rock and gravel to and between Stewart's several plants as its needs require is made by means of trucks operated by some 14 to 20 "contract haulers", who own, maintain, drive (or provide their own drivers for) these trucks. These haulers work by the year and are required to and do come to the plant or plants daily. They constitute in the main the method and means by which Stewart delivers sand taken from the river and sold to its customers, the delivery of which is an essential and integral part of the operation of the usual business in which it is engaged. Stewart, however, owns two trucks which are driven by its salaried employees and which on occasion are used to deliver sand and other material.

Among the approximately 14 regularly employed contract haulers was one Norval J. Coen, who, since December, 1946, has furnished and operated or caused to be operated two trucks for Stewart. Plaintiff Ward was and since 1950 had been regularly employed and paid exclusively by Coen as the operator of one of these trucks. Certain portions of a written contract under which Coen operates are stressed by Ward as pertinent to the issues here presented, to wit:

"4. * * * Stewart shall notify the contractor [Coen] of the material or property to be transported, and of the time and location of the place to load the same, and of the place of delivery, all within a reasonable time prior to the date that delivery is required; * * *

*  *  *  *  *  *

"6. * * * Stewart shall have no control over the truck drivers or any other persons used or employed by contractor, nor shall Stewart have any control over the route, method of hauling or transportation, or the detail or management thereof. * * * [T]he contractor * * * shall, at his own cost and expense, furnish all necessary labor, equipment, gasoline and oil, repairs, other supplies, and all other things necessary to that end, and shall have full charge, control and responsibility over the manner and method employed, and shall pay all taxes levied in connection with such operations.

"7. Stewart agrees to pay the contractor for the performance of hauling service in accordance with the following rate schedule, * * *: up to and including 5 miles one way haul at 30 cents per ton of 2,000 pounds, plus 4½ cents per ton for each mile thereafter.

*  *  *  *  *  *

"9. * * * (a) That said contractor herein shall stand solely in the capacity of an independent contractor;

(b) That said Stewart shall exercise no direction or control over any of the employees of the contractor or the manner in which any of the work or services hereunder to be furnished shall be performed; and (c) That under no circumstances shall any of the employees of said contractor be construed to be or have or exercise any rights or claims as employees of said Stewart."

In accordance with the provisions of the contract, Coen owned, maintained, repaired and fueled the truck driven by Ward. He also maintained the state and federal permits in his own name, carried liability insurance, did his own garaging, paid all social security, license and property taxes and expenses incident to operation under the contract, and paid Ward all of the compensation paid him for services rendered to Stewart.

The testimony further showed that, in practice, Stewart made the rules in the plant for loading and unloading the trucks operated by the contract haulers, all of whom operated under seniority lists kept, one by Stewart's truck superintendent, one by Stewart's sand clerk, and one by Stewart's plant superintendent. Stewart's Grand Avenue dispatcher designated the material to be hauled and when, where and to whom it should be delivered. Seniority was based on the truck, not on the men; it depended on how many trucks the particular contract hauler had and when he and the truck or trucks began hauling for Stewart. The seniority among the contract haulers worked as follows: If, for example, 14 contract hauler trucks appeared on the Stewart premises and only 10 loads were to be hauled, the first 10 in seniority would be selected to "get the loads." The first trucker to unload at Grand Avenue would get the next load. If Coen refused to haul when his turn came, Stewart's truck superintendent would call the next highest man in seniority, and so "down the list." If the superintendent went through the list and got "nobody", he would go back to Coen and he "would

have to have an awful good reason for not going." In case of emergency a contract hauler driver would be taken off his regular haul and required to haul within the Grand Avenue plant on a tonnage or hourly basis, depending on the decision of Stewart's truck superintendent; the drivers had no choice; Stewart's truck superintendent would ask the driver, not the owner.

Ward began work each morning at about 7:00 o'clock by going to Stewart's quarry at Pixley, getting a load of gravel and bringing it to the Grand Avenue plant. On November 10, 1955, Ward had hauled a load of rock· from Pixley to the Grand Avenue plant. Thereafter, during the day, he hauled sand to Stewart's customers in Kansas City. He had hauled about six or seven loads by 3:00 or 3:30 p. m. At that time he stopped on the plant scales and went to the scales house window on the Grand Avenue premises to report to one Petrie, Stewart's scales man, that there was a train blocking the road which prevented him from hauling another load before quitting time. After advising Petrie of these facts, Ward asked Petrie what he should do and Petrie, in accordance with long-standing custom, directed him where to load, to wit: to "load there", indicating a place some 15 or 16 feet away from the mixer house, but on the premises at the Grand Avenue plant. Ward began to obey the instructions given him by Petrie and would have continued in the performance of these duties until quitting time had he not been then and there struck and injured on Stewart's premises by its company-owned truck driven by Curry in the course of Stewart's business.

Stewart is and for many years has been a major employer under the Missouri Workmen's Compensation Law and Ward filed a claim for workmen's compensation benefits, under which he has been paid direct benefits in excess of $4,000 and medical benefits in excess of $2,800, and the claim is pending undetermined. Coen carried no workmen's compensation insurance.

Ward also brought the common-law action against Stewart and Curry (out of

which this garnishment proceeding arises) for the recovery of damages for the personal injuries sustained by him, which action, prior to trial, Ward dismissed without prejudice as to Stewart. Upon trial against Curry, the defense was conducted by and at the expense of Standard under a reservation of rights and non-waiver agreement signed by Standard and Curry. As stated, the trial resulted in verdict and judgment for Ward against Curry in the sum of $37,500.

The trial court found, in substance, that although Ward had sought from and had been paid workmen's compensation benefits by Stewart as Stewart's "statutory employee" under the provisions of the Workmen's Compensation Act (Section 287.040 RSMo 1949, V.A.M.S.), he was, however, not an "employee" of Stewart within the meaning of Clause III(c) of the insurance policy, in which, as stated, the insurance provided under the policy is made not applicable to "any employee with respect to injury to * * * another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of an automobile in the business of such employer." The further finding of the court was that Curry was an "additional insured" under the policy and that the policy thereby obligated Standard to satisfy Ward's judgment against Curry; and judgment was accordingly so rendered.

The situation thus presented is this: Curry, by whom Ward was injured, was concededly a regular employee of the named insured, Stewart. Clause III(c) excludes liability for the injury inflicted upon Ward by Curry if Ward, at the time of injury, was also an "employee" of Stewart within the meaning of that clause.

Certain provisions of the Workmen's Compensation Act, Chapter 287 RSMo 1949, V.A.M.S. (to which revision all statutory references herein are made) have a material bearing upon that issue. Section 287.020 defines an employee: "The word 'employee'

as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election." Section 287.030 defines an employer: "The word 'employer' as used in this chapter shall be construed to mean: Every person, * * * corporation, * * using the service of another for pay." Section 287.040 provides: "Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business."

■ The work at which Ward (Coen's contractual employee) was engaged on Stewart's premises when injured was an operation of Stewart's usual business and it was done at the direction of Stewart in the usual course of Stewart's business. Consequently, the declaration of the statute that in such cases Stewart is to be deemed an employer of Ward leads inevitably to the conclusion that under the Workmen's Compensation Act Ward is deemed an employee of Stewart, irrespective of the provisions of the contract between Coen and Stewart purporting to avoid any such relationship. Indeed, in Ward's brief, the "obvious proposition that Ward was Stewart's statutory employee" stands conceded.

■ The purpose of Section 287.040 is to prevent employers from evading the liability placed upon them by the Workmen's Compensation Act by doing through independent contractors what they would otherwise do through direct employees; and the federal and state courts respect and rigidly enforce its provisions. Viselli v. Missouri Theatre Bldg. Corp., Mo., 234 S.W.2d 563, 566 [2]; Atlas Powder Co. v. Hanson, 8 Cir., 136 F.2d 444; Montgomery v. Mine La Motte Corp., Mo., 304 S.W.2d 885, 888 [2–4].

The Montgomery case, supra, involves facts quite similar to those presented in the instant case. There plaintiff Montgomery was a truck driver employed by Smith, who, under contract with defendant, hauled lead ore from one of defendant's mines to its processing plant. While so engaged, plaintiff sustained injuries on defendant's premises arising out of and during the course of his employment. This court held, loc. cit. 888:

"There is no question but that it was in the usual course of defendant's business to have the ore at the offset mine loaded into trucks and transported to the processing mill. This was an essential step in the normal operations of defendant, and the record shows that it was not uncommon for defendant to do this work with its own trucks and employees. Also, the accident in this case which resulted in the injury to plaintiff occurred in the mine which was owned and operated by defendant and was under its exclusive and complete control. Therefore, the injury to plaintiff occurred on the 'premises' of defendant, as that term is used in Section 287.-040(1). * * *

"Section 287.040(1) establishes what this court has termed a 'constructive' relationship for purposes of creating liability under the Act on the part of one who has work done by contract under the specified factual situation. * * * It has the laudable purpose of preventing one from escaping such liability by entering into contracts with other persons to perform work on or about his premises which is in his usual course of his business. * * * The existence of the constructive relationship for the purpose of establishing liability does not depend upon the substantive law pertaining to an employer-employee relationship. Therefore, the existence of the constructive relationship, and the resulting liability, provided for in Section 287.040(1) does not depend upon the affirmative consent

of the so-called statutory employee. * * * Therefore, if Smith was an independent contractor, under the circumstances of this case, defendant was the statutory employer of plaintiff for purposes of liability under the Act by reason of Section 287.040(1) * * *. In such event the rights and remedies provided by the Act exclude all rights and remedies of plaintiff against defendant that he might have had at common law, and the trial court correctly entered judgment for defendant."

Ward insists, however, that even though he was a statutory employee of Stewart under the Workmen's Compensation Act, he was not Stewart's "employee" as that term is used in the exclusion clause (c) of Par. III of the policy. His position is that "employee", as used in the policy, means an employee in the common-law "master and servant" sense. Cited in support of his position is State ex rel. Maryland Casualty Company v. Hughes, 349 Mo. 1142, 164 S.W.2d 274, 277, which, upon examination, we find not applicable under the facts in this case. Of course, if the word "employee", as used in the policy, is to be construed to include only Stewart's contractual employee in the common-law master and servant sense, then a "statutory employee", such as Ward when he was injured, is not an employee within the exemption clause (c) of Par. III of the policy. We are not persuaded, however, that the term "employee" as used in the exclusion clause (c) of Par. III of the policy relates only to a common-law master and servant relationship and especially is that our thought in construing the meaning of the term "employee" when used in an insurance policy which on its face, as we think, reflects that the only coverage intended is the liability of the named insured to the public, as distinguished from the named insured's liability to its employees, direct or statutory, under the Workmen's Compensation Act.

The word "employee" may and frequently does have many different meanings in the multitude of varying connections in

which it is used. State ex rel. Maryland Casualty Company v. Hughes, supra, 164 S.W.2d 274, 277. "It is not a word of art, but it takes color from its surroundings and frequently is carefully defined by the statute where it appears." 30 C.J.S. Employee, p. 226. The question of who is an employer and who is an employee under workmen's compensation acts is determined upon the terms and definitions set forth in such acts. Loudenslager v. Gorum, 355 Mo. 181, 187, 195 S.W.2d 498, 500; Wigger v. Consumers Cooperative Association, Mo.App., 301 S.W.2d 56, 60.

In Missouri, the courts consistently turn to the Workmen's Compensation Act in determining the meaning of the word "employee" as used in exclusion clauses of liability insurance policies, involving questions fairly analogous to that here presented. Thus, in Campbell v. American Farmers Mutual Ins. Co., 8 Cir., 238 F.2d 284, 286, the insurer brought a declaratory judgment action against a school district and Campbell, seeking to be held not obligated by its policy of liability insurance issued to a Missouri school district covering a school bus in which Miss Campbell, a teacher employed by the school district, was riding when injured through the negligence of the school district's bus driver. The insurer's contention was that neither the school district nor its driver was covered by the policy because exclusion clause (d) stated that the insurance did not apply to "bodily injury * * * of any employee of the insured while engaged in the employment * * * of the insured." The trial court held the exclusion clause inapplicable. Upon appeal to the U. S. Court of Appeals, 8th Cir., that court held the question was to be determined under the law of Missouri and thereupon commented further, loc. cit. 287:

"Defendants argue that workmen's compensation cases such as the Sylcox case [Sylcox v. National Lead Co., 225 Mo.App. 543, 38 S.W.2d 497] should not be controlling here. The Kansas City Court of Appeals (Missouri) neverthe-

less used such cases including the Sylcox case, in interpreting the language of a somewhat similar clause contained in a group accident policy. Gage v. Connecticut General Life Ins. Co., Mo. App.1954, 273 S.W.2d 761, 763, [47 A.L.R.2d 1234]. From this it would seem that both the Missouri courts and this court are in agreement in relying upon Missouri workmen compensation cases in determining when an employee is engaged in his master's employment in situations similar to that with which we are here concerned, and we see no reason to depart from that reliance."

The Gage case, supra, referred to in the foregoing case, also dealt with an analogous situation. In that case, 273 S.W.2d 761, 763, plaintiff, Frances Gage, an employee of TWA, was injured on July 30, 1951, while riding en route to her place of employment in a bus operated by her employer for the use of its employees in going to work, in a collision of the bus in which she was riding and certain other buses. On that date, there was in force between the defendant insurer and TWA and plaintiff a group accident and sickness policy, providing for benefits to TWA's employees, subject, however, to the following condition: " 'The insurance hereunder shall not cover any disability due to injury arising out of, or in the course of, any employment for wage or profit; * * *.' " The question presented was whether plaintiff was injured " 'out of, or in the course of' " her TWA employment. The Kansas City Court of Appeals, in discussing the question, said of the issue presented, loc. cit. 763:

"The parties in their able and exhaustive briefs agree that it is obvious from the language of the policies that defendant's intention was to provide certain benefits to the employees of TWA for injuries sustained while 'off-the-job'. An opposite construction would mean that TWA voluntarily undertook to pay premiums for group disability, hospitalization, medical and surgical insurance on its many em-

ployees while at the same time it was required to provide a duplicating workmen's compensation for on-the-job accidents and medical attention.

\* \* \* \* \* \*

"Plaintiff contends that the court erred in that it failed to apply the rule that where the terms of an insurance policy are ambiguous they are to be construed against the insurer and liberally in favor of the insured. Of the correctness of that rule there can be no doubt. On the other hand, it is equally well settled that where the language of an insurance policy is plain and unequivocal, there is no room for construction, and the words employed must be given their usual and natural meaning. Courts are without authority to re-write contracts of insurance."

The court then turned to the provisions of the Workmen's Compensation Act and cases decided thereunder for ascertainment of the meaning of "injury *arising out of, or in the course of,* any employment," etc., as that phrase was used in the exclusion clause above quoted. After extended consideration of the meaning of the above phrase, as used in the Workmen's Compensation Act and as declared in numerous cases, the court found that, loc. cit. 764:

"Since first used in Missouri in 1925 (now Section 287.120(1) RSMo 1949, V.A.M.S.) 'out of' has acquired a settled and widely accepted meaning, and since the instant policies became effective long after 'out of' had become commonly used that particular use should be persuasive for our present inquiry. Essentially it is that any person acts 'out of' his employment when there reasonably can be said to be a direct cause and effect relationship between his employment and his injury."

Having determined the meaning of the phrase as used in the Workmen's Compensation Act, the court held that the language of the policy was "plain and unambiguous"

and affirmed the judgment of the trial court denying plaintiff any right of recovery under the policy in suit.

Bearing in mind the law as declared in the foregoing statutes and cases, let us take a square look at our case, to the end that we may, if possible, determine whether Ward was *"another. employee of the same employer* injured in the course of such employment in an accident arising out of the \* \* \* use of an automobile in the business of such employer" within the meaning of the policy. If he was, then Standard is not liable as garnishee in this action.

■ Stewart was a major employer under the Workmen's Compensation Act and as such was obligated as a matter of law to pay the statutory compensation allowed its *employees* (as the term "employees" was defined by the Act) who sustained injuries arising out of and in the course of their employment, and as such major employer, was required by law to insure its liability thereunder. Compliance with the provisions of the Act constitutes the full extent of Stewart's liability for any injuries sustained by its employees, direct or statutory, arising out of and in the course of their employment. Obviously, therefore, the insurance policy here in question was procured to cover *its liability to the public* for negligence of its agents, servants and employees under the doctrine of respondeat superior, especially those employees who operated its company owned trucks upon the streets of Kansas City in the hauling of its products and materials. The policy in issue covers that situation. However, Ward, who, by virtue of the provisions of the Workmen's Compensation Act, is limited to the compensation therein provided and cannot maintain a common-law action against Stewart under the doctrine of respondeat superior for the injuries sustained by him as Stewart's statutory employee, yet would have this court declare under the policy provisions in question that Stewart's insurer, Standard, is nonetheless liable, as garnishee, to him to the extent it would be under the doctrine of respondeat

superior; and this he would have us do upon the theory that the meaning of the term "employee", as used in the exclusion clause of the policy, is at best ambiguous and, therefore, to be construed in its most unfavorable sense to the insurer. We think that contention cannot be maintained.

In State Farm Mutual Automobile Ins. Co. v. Brooks et al., 8 Cir., 136 F.2d 807, 808, the court had occasion to consider an exclusion clause of a motor truck liability policy issued to defendant Brooks, which, among other things, excluded liability for "bodily injury to or death of any employee of the insured while engaged in the business * * * of the insured." In deciding that the clause did exclude the persons (one a minor and the other a representative of a deceased minor) who had sought and had recovered judgment against the policy holder in the circuit court in the state (of Missouri) court, announced the following principles underlying its conclusions, loc. cit. 811:

"It is recognized that generally the insured and all the persons who are working for him for wages in his business are excluded from the insurance. A cardinal object of the insurance is to distinguish between the public and those engaged in the business, and to include the former and to exclude the latter."

And further, loc. cit. 812:

"The minority of the boys at the time of the accident is not material to the inquiry whether they were, as a matter of law, to be deemed members of the public covered by the policy, or employees engaged in the business of the insured. What was done determined their status as employees."

And in Lumber Mutual Casualty Ins. Co. of New York v. Stukes, 4 Cir., 164 F.2d 571, the court considered a clause similar to that in Brooks, supra, and held, loc. cit. 573:

"The purpose of the exclusion clause is to limit coverage to liability for injury to members of the general public and to exclude liability to employees of the insured. See State Farm Mutual Ins. Co. v. Brooks, 8 Cir., 136 F.2d 807; Clinton Cotton Oil Co. v. Hartford Accident & Indemnity Co., 180 S.C. 459, 186 S.E. 399."

These cases, standing alone, clearly reflect the interpretation which we think must be placed upon Clause III(c). However, we note a further provision contained in the policy that is strongly indicative of a specific exclusion from coverage of the very injuries for which Stewart became obligated to pay Ward workmen's compensation irrespective of whether such compensation is paid him as a contractual or statutory employee. That clause, found under the heading "Exclusions", provides as follows:

"This policy does not apply: * * * (c) under Coverage A, to any obligation for which the insured or any company as his insurer may be held liable under any workmen's compensation law, or * * * to bodily injury to * * * any employee of the insured while engaged in the employment of the insured * * *."

■ Ward challenges our right to consider that provision on grounds it was neither pleaded nor presented to the trial court. Standard contends it was sufficiently pleaded. We think it immaterial whether it was or not. The policy was introduced in evidence by Ward and it is our duty and privilege to consider any clause or provision therein which may shed light upon any of its other provisions. Cain v. Robinson Lumber Co., 365 Mo. 1238, 295 S.W.2d 388, 390.

It appearing that Ward and Curry were employees of the same employer, to wit: Stewart, the named insured, and that the purpose of the policy in issue was to insure Stewart's liability to the public, as distinguished from those working for it and entitled to compensation under the Workmen's Compensation Act for injuries sus-

tained in the course of such employment, it must and does follow that the policy in suit, by virtue of the exclusion clause in Par. III(c), does not cover Curry's liability under the aforesaid judgment.

The conclusions above reached make it unnecessary that we consider the other numerous points asserted by each of the parties herein.

The judgment against garnishee is reversed.

All concur.