**Mrs. Ada Z. BROWN, Individually and as Natural Tutrix of Ambrose Floyd Brown, Jr., Thomas Harry Brown, Sandra LaVerne Brown and Vickie Helen Brown, Plaintiffs,**

v.

**ETHYL CORPORATION and the Travelers Insurance Company, Defendants.**

**John W. SCOTT, Plaintiff,**

v.

**ETHYL CORPORATION and the Travelers Insurance Company, Defendants.**

**Civ. A. Nos. 2257, 2258.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Sept. 25, 1963

Cooley & Cooley, David E. Cooley, Slidell, La., Durrett, Hardin, Hunter, Dameron & Fritchie, Calvin E. Hardin, Jr., Wallace A. Hunter, Baton Rouge, La., for plaintiffs.

Taylor, Porter, Brooks, Fuller & Phillips, Frank M. Coates, Jr., Charles W. Phillips, Baton Rouge, La., for The Travelers Ins. Co.

Kantrow, Spaht & Kleinpeter, Carlos G. Spaht, Baton Rouge, La., for Hartford Accident and Indemnity Co.

AINSWORTH, District Judge.

These two diversity suits for damages were filed under the Louisiana Direct Action Statute,[1] permitting suits direct-

---

1. LSA–R.S. 22:655.

ly against a tort-feasor's insurer, and were consolidated for trial to the court without a jury.[2] They involve the claims of the widow and children of a deceased bricklayer and that of his helper, growing out of an accidental chlorine gas release which occurred on May 7, 1959 in the Baton Rouge, Louisiana, plant of Ethyl Corporation exhausting the deadly gas into an acid tower which the two men were repairing. Brown died and Scott suffered physical injury as a result of the accident.

The acid tower is a round steel vessel 25 feet in height and 3 feet in diameter. It is lined with brick. The only means of entrance and exit are from the top. Brown, the bricklayer, was lowered down to the bottom to repair the brick lining by a hoisting device operated by his helper, Scott, who was stationed at the top of the tower. The chlorine was released into the working area immediately following a power interruption to an electric motor driving one of several compressors in service at the time. The pressure of gas being delivered by the other compressors forced chlorine gas backwards through the temporarily idled compressor. Gas also escaped from a "blank" (a steel plate placed over an opening in the system and covered with pitch to make an airtight seal) in the relief line situated near the opening of the tower causing a concentration of chlorine gas in the vicinity of the tower and the room in general. This blank was found ajar after the accident, and it is not known whether the gas surge knocked it loose or it was removed at some other time. Chlorine is several times heavier than air and it descended in fairly heavy concentration to the bottom of the tower where Brown was working.

Suits were filed against Ethyl Corporation and its public liability insurer, The Travelers Insurance Company; however, motion for summary judgment was granted in favor of Ethyl and Travelers as its insurer. The court retained jurisdiction against Travelers alone as the insurer of Ethyl's officers, directors, agents, servants and employees.[3]

Hartford Accident and Indemnity Company has intervened, claiming reimbursement for Louisiana workmen's compensation which it paid as insurer of Caldwell, in the stipulated sums of $10,769.50 for the death of Brown and $807.75 for Scott's injuries.

The workers, Brown and Scott, were employed by George A. Caldwell, a large industrial building contractor with operations in numerous places in Louisiana and headquarters at Baton Rouge. Caldwell, under written contract with Ethyl Corporation, was engaged to perform brick maintenance work in the large Chemical Plant of Ethyl at Baton Rouge.

Plaintiffs base their claims in tort against defendant, Travelers, under its public liability insurance policy in which Ethyl is the named insured, and the executive officers and employees of Ethyl while acting in the course and scope of their employment are set forth as additional insureds. Plaintiffs aver that the accident was caused by the negligence of Ethyl's executive officers and employees in the operation and maintenance

2. Jury trial was requested by plaintiffs on January 25, 1963, more than three years after suit was filed. Defendant objected and the court declined to permit a jury trial on authority of Fed.R.Civ.P., Rules 38(b) and 39(b).

3. Judge Christenberry, to whom the case was originally assigned, so ruled on January 24, 1961. No reasons for judgment were given. Judge Christenberry also overruled defendant's plea of the one-year prescription for tort actions in Louisiana. Defendant contended that plaintiffs having amended their complaints more than one year after the accident, at which time they set forth in detail the basis of their demands against Travelers as insurer of Ethyl's directors, stockholders, executive officers and employees, prescription has barred these suits. In the original complaints Travelers is definitely sued as the public liability insurer of Ethyl Corporation's agents, servants or employees. The amended complaints merely clarified and amplified the allegations already made in the original complaints. On reconsideration, we deny the plea of prescription filed by defendant.

of the plant. They have not sued the Ethyl executive officers and employees, but have sued only their insurance carrier as they have a right to do under the Louisiana Direct Action Statute.

Defendant contends that plaintiffs' suits must fail because there is no insurance coverage under the Travelers liability policy in favor of an employee injured through the negligence of another employee of the named insured. Under the terms of the cross-employee exclusion in the policy, coverage is not afforded to any employee with respect to injury or death of another employee of the named insured injured in the course of his employment.[4] Brown and Scott are claimed to be either statutory employees of Ethyl or employees under the doctrine of respondeat superior. Under either theory defendant says plaintiffs must lose because if Ethyl's plant employees were negligent in plant operation or maintenance, they caused injury to fellow plant employees, Brown and Scott, and this contingency is not covered by the policy. Plaintiffs' exclusive remedy, they contend, is under the Louisiana Workmen's Compensation Law.

Therefore, the defense is that there is no insurance coverage because the injured employees were so-called statutory employees of Ethyl Corporation under provisions of the Louisiana Workmen's Compensation Act (LSA–R.S. 23:1061), and their claims are barred under the policy by the cross-employee exclusion as to torts by an Ethyl employee on a fellow employee. Under this section, where any person (as principal) undertakes to execute any work which is a part of his trade, business or occupation and contracts with any person (as contractor) for the execution of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay an employee employed in the execution of the work, or his dependent, any compensation which he would have been liable to pay if the employee had been immediately employed by him; if the principal is required to pay compensation, he shall be entitled to indemnity from the contractor.

Alternatively, defendant contends that there is no coverage under the cross-employee exclusion because the injured employees were Ethyl employees under the doctrine of respondeat superior in that they were doing ordinary maintenance and repair work for Ethyl, under its control and supervision, both as to time and manner of work.

Finally, defendant denies any negligence by Ethyl employees, averring that all reasonable measures had been taken by Ethyl to protect its employees and others from possible injury; alternatively, defendant pleads contributory negligence in bar of plaintiffs' claims.

Caldwell's maintenance contract is for a specialized kind of brickwork and has

---

**4.** Paragraph I of the Insuring Agreements section of the policy provides that The Travelers Insurance Policy agrees:

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."

Paragraph III of the Insuring Agreements section of the policy originally read in part as follows:

"The unqualified word 'insured' includes *the named insured* and also includes any executive officer, director or stockholder thereof while acting within the scope of his duties as such, * * *"

Paragraph III was amended effective January 1, 1959 to read in part as follows:

"(1) Insuring Agreement III definition of insured is hereby amended to also include *employees of the named insured as insured* while acting within the scope of their duties as employees.

"(2) The insurance afforded under this endorsement to such employees does not apply:

(A) Under coverage A to any employee with respect to injury to or sickness, disease or death of *another employee of the named insured* injured in the course of such employment;

(B) Under coverage B to injury * * *" (Emphasis supplied.)

738

been continuous at Ethyl for many years. Under its provisions the contractor has been paid on a 15% cost plus basis. Caldwell's foreman at the plant would be notified from day to day by one of Ethyl's superintendents of the need for brick maintenance work and the Caldwell men would be assigned to work accordingly. Wages would be paid to his workers by Caldwell who would in turn bill Ethyl for his out-of-pocket costs plus 15% for services rendered. Caldwell rarely, if ever, came on the job, relying entirely on his foreman. The foreman sent in his time sheets to Caldwell's Baton Rouge office where payroll checks were made up and issued to the men. The two workers here had been engaged in ordinary maintenance work at the plant for many years and were paid by Caldwell on an hourly basis. Caldwell employees did not belong to the same unions as Ethyl employees, they were not eligible for Ethyl retirement benefits, and they did not participate in the accident and sickness benefit plan of Ethyl or any other special benefits provided for Ethyl employees. Caldwell employees were paid directly by Caldwell after Social Security and income tax withholding deductions were made.

Defendant contends that these Caldwell employees were under the direct supervision and control of Ethyl employees and that under the doctrine of respondeat superior they were *in fact* Ethyl employees. As to the work to be done, and the number of men who would be required for specific work on certain days, there is no doubt that Ethyl employees were in control. Likewise, they supervised the work to some extent. But we have no doubt from hearing the witnesses that Brown and Scott were always Caldwell employees and acted under the direct supervision of the Caldwell foreman who was assigned full time to the Ethyl job. Caldwell and Ethyl also agreed in their written contract that in the performance of any work authorized under the contract, Caldwell should be considered "for all purposes an independent contractor and not an employee of Ethyl Corporation."

The courts have repeatedly held that an employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms without thereby creating such contractor an employee. Johnson v. Royal Indemnity Co., 5 Cir., 1953, 206 F.2d 561. The difference between the independent contractor and the employee lies chiefly in the fact that the contractor has a bargaining power in negotiating with the principal which is not possessed by the ordinary worker. Malone, Louisiana Workmen's Compensation Law and Practice, § 74.

Whether the injured person is an employee of the insured or another, or an independent contractor, depends upon the particular facts and circumstances of the case. 5A Am.Jur. 110; Patty v. State Farm Mutual Automobile Ins. Co., 6 Cir., 1955, 228 F.2d 363.

We hold, therefore, that Brown and Scott were employees of Caldwell, who had an independent contract with Ethyl Corporation for the brick maintenance work involved. They were in fact Caldwell employees and not Ethyl employees under the doctrine of respondeat superior. It would be unrealistic to believe otherwise.

Defendant contends that if claimants were so-called statutory employees under the Louisiana Workmen's Compensation Law (LSA–R.S. 23:1061), the cross-employee exclusion in their policy applies and these actions may not be brought by Ethyl employees for the torts of fellow Ethyl employees. The cross-employee exclusion states that the policy does not apply to any employee with respect to injury or death of another employee of the named insured (Ethyl). But Brown and Scott clearly were not employees of the named insured (Ethyl). They were employees of Caldwell.

There is no case in point in Louisiana which holds that the term "employee",

as used in the cross-employee exclusion in Travelers policy, refers to those persons to whom the named insured (Ethyl) could be held liable under the Louisiana Workmen's Compensation Law making a principal liable for compensation to employees of an independent contractor performing work which is a part of the trade, business or occupation of the principal.[5]

In order for a principal to be responsible for compensation under the provisions of the Louisiana Workmen's Compensation Act (LSA–R.S. 23:1061), it is not necessary that the claimant be an employee of the principal—he need only be an employee of any contractor who has contracted for the execution of a whole or part of the work undertaken by the principal. Louisiana law places primary responsibility for workmen's compensation on the injured employee's employer, since the Act specifically authorizes indemnification by the principal against his contractor should the principal be required to pay compensation. Nowhere is it evident in the Louisiana Act that it was intended that the injured employee be considered an employee of the principal. The terms "statutory employer" and "statutory employee" are apparently used loosely to cover such a relationship, for these terms are not found in the Act itself.

Defendant cites Ward v. Curry, 341 S.W.2d 830 (1960), a Missouri case, and Michaels v. United States Fidelity & Guaranty Co., Fla.App., 129 So.2d 427 (1961), a Florida case, as authority for the proposition that so-called statutory employees of an insured under a Workmen's Compensation Act are employees of the insured under the policy and not entitled to recovery in tort because of the cross-employee exclusion. We do not believe Louisiana State Courts would follow these decisions as authority for the same proposition of law here, nor are we impelled to do so. Each of the cited cases is dependent upon its own special facts and upon the special provisions of the Workmen's Compensation Acts of Missouri and Florida, respectively, Section 287.010 RSMo 1959, V.A.M.S.; F.S. A. § 440.01 et seq. These Acts are substantially different from the Louisiana Act. In Missouri, the word employee is specifically defined to mean every person in the service of any employer as defined in the Act; and any person who has done work on or about his premises which is in operation of the usual business which he carries on there is deemed an employer and is liable for compensation to employees of his contractor or subcontractor.

The provision of the Florida Act which was considered in the Michaels case, supra, provides that where a contractor sublets any part of his contract work to a subcontractor all of the employees of the contractor and subcontractor engaged on such contract work shall be deemed to be employed in one and the same business and the contractor shall be liable for the payment of compensation to all such employees.

The cited provisions of Missouri and Florida Acts are unlike those of the Louisiana Act (§ 1061). Nor do we find that the principal who is liable to pay compensation for his contractor's employees is entitled to indemnity from the contractor who independently would have been liable to pay compensation as is provided in the Louisiana Act. Nor do the policies of liability insurance in the cited cases cover the executive officers

---

5. We do not necessarily concede that Caldwell was performing work which is part of the trade, business or occupation of Ethyl. Caldwell is a building contractor, Ethyl a chemical manufacturer. Malone, in Louisiana Workmen's Compensation Law and Practice, § 125 at p. 152:

"Thus, work in the construction of buildings or equipment to serve an ordinary industrial establishment can ordinarily be let out to a contractor without the retention of compensation liability under this section, and the same is true of major repairs and other specialized operations which are customarily performed by contractors for the business in question."

and employees of the named insured as additional insureds, as in the present case. Accordingly, these cases may not properly be cited to apply to the facts, circumstances and law of Louisiana as presented in this matter.

■ The fact that Ethyl Corporation may have responsibility under the Louisiana Compensation Act to Brown and Scott as employees of Caldwell, secondary to that of Caldwell, does not in and of itself make these men Ethyl employees. We cannot construe the provisions of the Travelers policy in favor of the insurer to exclude coverage here unless the cross-employee exclusion in plain, unambiguous language excludes claims of employees of independent contractors who are not in fact or in law employees of the named insured.

In Pullen v. Employers' Liability Assurance Corp., 230 La. 867, 89 So.2d 373 (1956), the Louisiana Supreme Court held, in a matter involving a co-employee exclusion clause in a public liability policy, that:

"The exclusion clause must necessarily be examined and interpreted in the light of its own design and intent, as well as in view of the objects and purposes of the policy. Once coverage has been extended, as it is quite clearly the purpose of the policy to do and as has been done here, *it should be withdrawn only when exclusion is established with certainty.* And because comprehensive exclusion is violative of the purpose and intent of policy coverage, *exclusion must necessarily be specific and not general.* It is specific, as distinguished from comprehensive, when it particularly identifies the insured or insureds intended to be excluded. The exclusion clause, as its name implies, sets forth the traits, characteristics and circumstances that mark an insured for exclusion. And the insured or insureds to be excluded must bear the marks and traits, or conform with the circumstances, described and particularized in the exclusion clause as the basis for exclusion." (Emphasis supplied.)

We have pointed out that the accident occurred because of a power interruption to Nash Pump No. 10 in the Ethyl Corporation plant and the ensuing release of chlorine gas into the area. The dangerous propensities of chlorine are well known. It cannot be inhaled even for very short periods of time without serious bodily injury and sometimes death.

■ On the merits we find that employees of the Ethyl Corporation plant, solely under their control, were negligent:

(a) In failing to maintain periodic electrical load checks on Nash Pump No. 10. Such checks were not even run on the occasion of the prior failures of this pump on June 9, July 3, August 1 (twice) and August 7, 1958. Despite a past history of frequent trouble from power failures or kickouts at this pump, the trip relay in the overload circuit for No. 10 was not checked in routine maintenance. It was not discovered, until after the accident, that the trip relay was faulty. Had load checks been run by Ethyl employees prior to the accident, as they should have been, the trouble would have been found, corrected, the chlorine gas release averted and the kickout and accident avoided. It is a proper inference from the evidence that because it was time-consuming to make such load checks they were not made.

(b) In failing to provide proper clamps in the chlorine gas lines on a blank on the Nash Pump suction header, and in failing to seal the blank properly, thereby permitting the gas surge to knock the existing clamp loose and discharging gas into the working area. This blank was only 15 feet away from the open top of the tower being repaired.

(c) In faulty design and maintenance of the vent lines from the towers to the acid trap (a safety exhaust). The design produced low spots in the line and plant maintenance failed to check or remove the collected waste or foreign matter which partially clogged the line and pre-

vented proper operation of the acid trap which would thereby have exhausted the deadly gas into the atmosphere instead of into the area where the two involved workers were at the time.

(d) In failing to equip Pump No. 10 with a check valve which would have eliminated the flowback of chlorine into the pump when it was stopped because of electrical failure. Such a valve would automatically close the line when a pump kickout occurred.

(e) In not furnishing adequate gas masks for these workers in a known dangerous area where chlorine gas releases had frequently occurred before. The respirator mask routinely provided and required was nothing better than an escape mask so that a worker might run from the gas and reach a position of safety. Brown never had a chance to escape. As soon as the released gas descended into the tower in which he was working, he began choking and we conclude that he was unable to use the respirator mask. Had he been provided with a gas mask it is most likely that he might have escaped without serious injury. Scott's injuries likely might have been averted had he been provided with a proper gas mask.

Ethyl's employees were charged with the highest possible duty of care to protect persons lawfully present within the chlorine gas area from bodily injury. Knowing the deadly character of this gas, and having had numerous gas releases in the area before, all employees, managers, superintendents and executives were aware, or should have been, of their duty to take every possible precaution to prevent accidental inhalation of chlorine with its resultant lethal effects to persons in the area. We believe they failed in their duty and that this was the proximate cause of the accident. Nor was there contributory negligence on the part of either Brown or Scott. The chlorine gas descended so suddenly upon Brown, who was in the bottom of the tower, that he had little opportunity to protect himself. He assisted in pulling himself out of the tank as best he could. Scott was also immediately affected by the gas and began violent coughing. He ran for assistance and helped lift Brown out of the tower. Though he may not have exercised the best judgment under the circumstances in running for help and leaving Brown in the tower, we are convinced that he acted in good faith and did what he thought best to aid his co-worker.

We find that the decedent, Brown, suffered severely from his injuries for nearly three hours until his death. He was 34 years of age, his widow was 32 years of age and his children 4, 7, 9 and 12 years of age at the time of his death. His average earnings were about $7,500.-00 per year. Funeral expenses in the sum of $1,761.83 were incurred.

Scott spent sixteen days in the hospital after the exposure to chlorine and was not returned to work until July 1, 1959. He undoubtedly experienced considerable pain and suffering but though there is evidence that he has some residual effects from his injuries, the proof is not strong. He has been able to resume his duties as a brickmason's helper.

Under the circumstances, we believe that fair and proper awards for claimants are as follows:

Mrs. Brown, $56,761.83, less the sum of $10,769.50, paid as workmen's compensation by intervenor, Hartford Accident and Indemnity Company; Vickie Brown, $8,500.00; Sandra Brown, $8,000.00; Thomas Brown, $7,500.00; Ambrose Floyd Brown, Jr., $7,000.00; these awards, all being for minor children, are awarded to Mrs. Brown for the use and benefit of such minors.

Scott, $4,000.00, less $807.75, paid as workmen's compensation by Hartford Accident and Indemnity Company.

Hartford Accident and Indemnity Company, as intervenor, is awarded judgment for the amount of workmen's compensation benefits paid to Mrs. Brown and Scott in the total of $11,577.25.

Judgment will be entered accordingly.