W. O. TURNAGE and Jimmie Mills, by Next Friend W. O. Turnage, Plaintiffs-Appellants,

v.

STATE FARMERS MUTUAL TORNADO INSURANCE COMPANY OF MISSOURI, Defendant-Respondent.

No. 8342.

Springfield Court of Appeals.

Missouri.

Feb. 18, 1965.

Motion for Rehearing or to Transfer to Supreme Court Denied March 10, 1965.

Application to Transfer Denied May 10, 1965.

Kenneth L. Dement, Sikeston, for plaintiffs-appellants.

Jackson, Thomasson & Dickerson, Cape Girardeau, for defendant-respondent.

RUARK, Presiding Judge.

This is a suit on an automobile liability policy. The plaintiffs Turnage and Mills received a jury verdict against defendant State Farmers Mutual Tornado Insurance Company. Thereafter defendant's motion for judgment in accordance with the motion for directed verdict at close of evidence was sustained and judgment entered for defendant. Plaintiffs have appealed.

The policy in question was issued to W. O. Turnage, a farmer, covering liability in respect to operation of a Dodge truck. The definition of insured included those driving with permission, but the definition did not apply "(2) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of the automobile in the business of such employer." Under Exclusion (d) the policy did not apply to "bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of (1) domestic employment by the insured, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law, or (2) other employment by the insured."

Jimmie Mills, seventeen-year-old stepson who lived with insured Turnage, was driving the truck bringing a group of teenage boys home from a haying operation. One of the boys, Larry Jones, fell off the truck and was killed. His parents secured judgment against both Turnage and Mills. State Farmers Mutual refused to accept liability. Turnage and Mills satisfied the judgment and brought this suit. The principal question presented to us is whether Larry Jones was an employee of the insured and, if so, whether his injury and death arose out of his employment. If so, coverage is excluded.

A part of the farming operations of named insured Turnage was the raising and feeding of cattle. He had for several years been growing hay, primarily to feed his cattle, and it was necessary each year to bale and put up hay. From time to time he had boys assist in that operation by picking up the bales (he ran the baler himself) and hauling them to and stacking them in shelter. The death of Jones occurred on August 30, 1961, when a group of five boys were returning from work on a farm which is referred to as "the Bell City farm." Only a few days before this particular incident Turnage had been engaged in a similar haying operation at what is called the "Randles job." The method of operation, transportation, and rate of pay, were the same on the Randles job as at the Bell City farm with which we are concerned; and at least some of the five boys on the Randles job were the same ones who worked on the Bell City job. There seems to be some disagreement in the evidence as to whether or not the deceased Larry Jones had worked on the (prior) Randles job, but we do not consider it important as to whether he did or not.

As stated, the method of operation was the same. Turnage ran the baler and the boys gathered up the bales, loaded them on the flat-bed truck, and hauled them to and stacked them in the particular barns designated by Turnage. They took turns driving the truck, none of them was boss over the others, and all five including Jimmie, the stepson, shared in the total piece-rate

wage of ten cents per bale, or two cents per bale for each boy.

As to just how the particular teen-agers came to be employed for the Bell City job the evidence is rather cloudy. Some of the boys said that at the Randles job Turnage had mentioned later work. Turnage himself was rather vague on the subject; but it is admitted and well established that he told his stepson, Jimmie, to gather up a group of boys and take them to the Bell City farm work. These boys all lived in what is called the Painton, Hooe, or Popp City communities, and at varying distances from the Bell City farm. Estimates of these distances ranged from a minimum of five and one-half miles to a maximum of fifteen miles. If the testimony of the surviving boys (Jimmie not included) were to be accepted, they had no means of going to this work if transportation was not furnished. Turnage, on the other hand, expressed the opinion that "they had other ways of getting there," but he did not elaborate. Turnage conceded that he directed Jimmie, his stepson, to pick up the boys and bring them to work on August 29th. Jimmie accordingly, driving the flat-bed Dodge truck, went around to their homes, picked them up, and took them to the Bell City farm. Plaintiff Jimmie testified that he didn't know what "arrangements" had been made to get the boys to work. "It was just understood that they would be home and I would just pick them up wherever they was at." He also understood he was to take the boys home from the field at night. "Everybody takes their hayhaulers home." Plaintiff Turnage testified that *he* didn't agree that the boys were to be taken to the job; but he agreed that he asked Jimmie to go get them. He said he didn't remember exactly whether he had already talked with any of the boys. "I might have asked them if they would want to haul hay a little later." He said it was "not necessarily" customary to pick the boys up and take them out on the job. "We did that for their convenience as much as anything else, I guess."

On the first day (August 29th) Turnage was present operating his baler and the boys picked up and hauled the bales. One field was finished. Turnage started on another, decided that the hay in that field was a little too green, and shortly called the work off for that day. He used his pick-up (not the insured Dodge) to take the boys back and "dropped them off" at a store in the neighborhood of their homes.

On the following day (August 30th) Turnage, again in his pick-up, gathered up the boys and took them out to the farm. He again ran the baler and the five boys (alternating at driving the Dodge truck while the other boys loaded) picked up the bales, hauled and stacked them in the barn specified by Turnage. About four o'clock in the afternoon Turnage left the field. Here again the evidence is a little vague as to whether he left because he had a headache or because he had cut and baled all the hay he felt was desirable; but for our purpose here, most favorable to the verdict holder, we will assume that he had finished all the cutting which was to be done on this farm. When he left the field he told the boys to "come on in and bring the truck" when they had finished with the job of bringing in the hay. After the work was completed and the last bale of hay was hauled and loaded in the barn,[1] they started home. Jimmie was driving the truck, one boy rode with him in the cab, and the others, including Larry Jones, were standing on the flat-bed behind. Shortly after turning out of the field and onto the highway the accident occurred.

Is the type and character of the employment, as the word is used in the policy, such as is not excepted or excluded by the terms of the policy? Was the employment merely "casual" or "incidental"? Ap-

---

1. The collective total due to the five boys for the two days' work was forty-six dollars. This was paid a few days later by paying the proportionate amount owed to each boy.

pellants rely upon Daub v. Maryland Casualty Co., Mo.App., 148 S.W.2d 58. In that case the St. Louis Court of Appeals held that the words "not employed" in the policy were ambiguous, so as to leave the policy open to construction; and that the obvious purpose of such words was to exclude persons *regularly* employed, not mere occasional, incidental or casual employees. It was the view of the court that a boy hired to do odd chores about a house or yard on three different and irregular occasions was not "employed" and, therefore, not excluded. In the same case (State ex rel. Maryland Casualty Co. v. Hughes, 349 Mo. 1142, 164 S.W.2d 274), the Supreme Court stated that it was not concerned with whether the construction adopted by the Court of Appeals was the one it would have given, but the single and determinative inquiry was whether the language was *subject* to construction at all. It held that the words "not employed" introduced an ambiguity, so the policy was subject to construction and certiorari was quashed.

Since then the Daub case has been distinguished in cases factually similar to the one at hand. In Farm Bureau Mutual Ins. Co. v. Farmers Mutual Auto Insurance Co., Mo.App., 360 S.W.2d 325, the exclusion was in language similar to that in our case. The injured person was a teenager engaged in picking up and hauling hay, as here. He had worked from four to six hours on from two to five days before the incident. It was held that the boy was doing work that was a necessary part of the employer's means of making a living, a part of his farming operations. His work was not a "chore" but a "substantial, ordinary, recurring and necessary part of the insured's regular business." Hence, he was engaged in employment within the exclusion provision of the policy.

In State Farm Mutual Automobile Ins. Co. v. Brooks (8th Cir.) 136 F.2d 807,

two boys were temporarily employed at one dollar per day to pile wood at a sawmill and to load the truck so that fuel wood could be hauled to and unloaded at Joplin where the employer was engaged in the fuel business. The exclusion was as to "any employee of the insured while engaged in the business * * * of the insured." The boys were on a truck returning to Joplin, and the truck was being driven by a son of the insured. It was held that, although the employment contemplated no more than a week's work, it was not a mere chore but a substantial, ordinary, recurring and necessary part of the insured's regular business. The boys were held within the exclusion.

█ Putting up hay was a necessary part of the insured's business, which was farming and stock raising. The gathering and preservation of the hay was essential, whether the insured intended to sell it or, as here, feed it to the cattle. It was a regular, recurring, although seasonal, activity as distinguished from an irregular, occasional or incidental transaction not associated with his usual and ordinary business. Once the employer-employee relationship was established, it makes no difference, in the interpretation of the policy, that the employee had worked but a short time. We hold that the boys were "employees" (as distinguished from occasional, odd job, chore boys) within the terms of the policy.[2]

A more difficult question is raised by appellants' principal contention. They argue forcefully, and with some logic and case support, that, whether or not there was "employment", it had *ended*. The last bale of hay had been put away. The last work was done. The job was finished. Nothing more remained to be done in respect to the employment except the payment of the boys for their services. The boys were on their way home from the hayfield, being so transported on the flat-bed truck.

2. See 7 Am.Jur.2d, Automobile Insurance, § 132, p. 455; and 50 A.L.R.2d Annotation p. 82.

The question squarely presented then is: Do the terms of the exception and exclusion apply when an employee has finally completed his work and is being transported from the place of employment to his home? The appellants rely heavily upon Schnurman v. Western Casualty and Surety Co., 352 Mo. 650, 179 S.W.2d 31, as the only Missouri case involving termination of employment. That case, as we interpret it, is a "the result could not be different in any event" decision. It involved a single trip down through Oklahoma. Plaintiff rode with his brother-in-law Figlure and was injured on the return trip. Both plaintiff and Figlure testified that plaintiff was not employed by Figlure, and no witness testified that he was. The evidence very strongly indicated that plaintiff *never had been* employed. However, the trial court found as a fact that plaintiff had been so employed but the merchandise had been disposed of in Tulsa and the employment was then terminated. The Supreme Court held that the findings of fact did not constitute a special verdict and could not be considered on appeal other than as a general finding for the plaintiff; but the result could not be different if the findings of fact be considered as a special verdict; and the court concluded (179 S.W.2d loc. cit. 34) that in view of the evidence set out there could be no question as to the sufficiency of plaintiff's evidence to support the *general finding* in plaintiff's favor. We do not regard this case as holding, as a matter of law, that one on a return trip after the job has been completed is not an employee.

Appellants cite various foreign cases, some of which we think are distinguishable and, in the interest of brevity, do not discuss. Other cited cases [3] at least raise the question as to whether, in those jurisdictions, the workers on their return ride home would be considered as employees within the policy exclusion.

While the idea did not originate in this court, the Missouri courts (and those in some other states) have consistently turned to the Workmen's Compensation Act and the decisions thereunder in questions involving the meaning of the word "employee" as used in exclusion clauses of liability insurance policies. Ward v. Curry, Mo., 341 S.W.2d 830, 836; Campbell v. American Farmers Mutual Insurance Co. (8th Cir.) 238 F.2d 284, 287. An injury is said to arise "in the course of" employment when the workman is engaged in doing some duty which he is employed to perform, or in doing something associated with and incidental to such duty. It arises "out of" such employment when there is a causal connection between the conditions under which the work is performed and the resulting injury. McFarland v. St. Louis Car Co., Mo.App., 262 S.W.2d 344, 346; Gage v. Connecticut General Life Insurance Company, Mo.App., 273 S.W.2d 761; Howes v. Stark Bros. Nurseries and Orchard Co., 223 Mo.App. 793, 22 S.W.2d 839, 844.

Whether the employee is engaged in such employment while being transported to and from work so as to bring him within the exclusion clause of an insurance policy depends upon the contract of employment. In the words of that profound and clear-speaking jurist Bennick (Sylcox v. National Lead Co., 225 Mo.App. 543, 38 S.W.2d 497, 499–500):

"* * * Generally speaking, it is the scope of the contract of employment which furnishes the determinative test of whether such an accident is one for compensation. In other words, it is the contract of employment, and not the actual commencement of labor, which establishes the relationship of the parties under the act. If the right to transportation is given, either positively or inferentially, by the terms of the con-

3. B. & H. Passmore Metal & Roofing Co. v. New Amsterdam Cas. Co. (10th Cir.) 147 F.2d 536; Elliott v. Behner, 150 Kan. 876, 96 P.2d 852; Commercial Cas-

ualty Ins. Co. v. Cherry, Ark., 79 S.W.2d 270; see also Green v. Travelers Ins. Co., 286 N.Y. 358, 36 N.E.2d 620.

tract, the employment begins when the employee boards the bus to go to the scene of his labor; it continues throughout the entire period of transportation; and it terminates when he leaves the bus at his home. If the contract provides in express terms for transportation, there is but small room for controversy, but, where its provisions are to be implied from the nature and circumstances of the employment, many considerations may be involved, such as whether the furnishing of transportation was merely an act of courtesy, wholly disassociated and disconnected from the relationship of master and servant; whether the employee received pay for the time spent on the bus; whether the furnishing of transportation was with the knowledge and acquiescence of the employer; and whether the course of the employment may extend beyond the hours of the servant's actual labor, and to places other than the premises upon which his labor is performed.

" * * * [T]hat transportation to and from work may well be one of the incidents of the employment, and an accessory, collateral, or subsidiary part of the contract; that it is something added to the principal part of the contract, as a minor, but none the less a real, feature or detail of the contract; and that consequently an accident such as the one we have before us should be regarded as compensable, because it occurs within the period of the employment, at a place where the employee has a right to be, and while he is engaged in something incidental to his employment proper, because contemplated by it."

The reasoning of the Sylcox case has been followed and applied in Campbell v. Amer-

ican Farmers Mutual Insurance Co. (8th Cir.), 238 F.2d 284; Gage v. Connecticut General Life Insurance Company, Mo.App., 273 S.W.2d 761; State Farm Mutual Automobile Insurance Co. v. Brooks (8th Cir.) 136 F.2d 807, 811–812.[4]

In our case it was a necessary part of the employer's business to put up his hay. In order to accomplish this it was essential for him to have help in picking up, hauling, and stacking it. The evidence requires the conclusion that it was necessary or at least beneficial to the orderly and profitable conduct of his business for the employer to have this help at the place of work at the same time so that, after the bales had been disgorged by the baler, the gathering and hauling and stacking could be performed by those working together *as a crew.* The boys chosen to do this work lived in a rural community at varying distances from the place of work and not adjacent thereto. Arrangements *were* made to pick them up so they could be transported to work together and they *were* picked up and returned from work on both days by or at the direction of the employer.

In the language of Johnson v. Aetna Casualty and Surety Co. (5th Cir.) 104 F.2d 22, 23:

" * * * We think the judge was warranted in concluding that the transportation was an implied term of the employment. The distances from the homes of the men to their work was so great that transportation must have been considered by both employer and employee. The ride was not for the mere convenience of the employee after his work was done, but was for the forwarding of the employer's work in that it was necessarily provided to get these employees for the very moderate wages paid them."

4. See discussions and reviews 50 A.L.R.2d, Annotation, p. 92 et seq.; Hartford Accident and Indemnity Co. v. Hudson (E.D. Ky.) 124 F.Supp. 666; Griffin v. Cath-erine Sugar Co., 219 La. 846, 54 So.2d 121; also, 56 C.J.S. Master and Servant § 180 p. 868 et seq.; 99 C.J.S. Workmen's Compensation § 235, p. 834.

To the same effect is Griffin v. Catherine Sugar Co., supra, 54 So.2d 121, wherein it was stated "had transportation not been furnished, the defendant would have been unable to get the necessary help to harvest its crop."

 The question of whether or not transportation was a part of the express or implied terms of the contract is a mixed question of law and fact. If the basic question is one of fact it was for the jury to decide and we must, of course, accord every favorable inference to support the verdict. But these facts are clear: The boys, including decedent Jones, obviously lived in a rural community miles distant, too far to walk or hire other transportation at the wages paid. Whether we consider it in the light of defendant Jimmie Mills' testimony that "everybody takes their hayhaulers home", or in that of the more dubious and somewhat evasive "not necessarily" testimony of defendant Turnage, the bare fact remains that the presence of this crew of teen-age boys was necessary to his haying operation and that either by "custom" or "arrangement" the boys were to be taken to and returned home from the place of employment. Turnage was engaged in a recurring operation which called for the presence of a haying crew at the times needed. We will not indulge in surmise as to what would have happened to his general operations of this character in the future had he *refused* to take the boys home and left them stranded miles from their homes. We think the only reasonable conclusion which can be drawn from the evidence is that it was an express or implied "understanding" of the employment contract that the boys were to be transported to work and back to their home neighborhood, and that such transportation was to the benefit of the employer and "forwarded" his operations. That conclusion is not a decision as to a fact. It is an inescapable conclusion of law drawn from all the facts. Such being the case, the transportation was an ancillary and incidental part of the employment and an added or "fringe" consideration to be received by the employees. Accordingly, under the case law of this state by which we are bound, we must hold that the relationship of employer and employee existed throughout the return trip. The judgment must be affirmed. So ordered.

STONE and HOGAN, JJ., concur.

On Motion for Rehearing
or to Transfer

PER CURIAM.

Appellants feel they are outraged because in our statement of facts, we neglected to mention that, according to Turnage, when he was picking up the boys on the morning of the second day, he drove past the home of deceased Larry Jones, that as he did so "the other boys was beginning to holler, 'Wait, we got to get Larry,' so I backed up and Larry got out from his truck and got on the truck and we went on to the field." It is argued from this that there was a fair inference (a) that Larry owned a truck, (b) that he was preparing to drive himself to the hayfield, and (c) that insofar as this youth was concerned, this belies our conclusion that there was an implied understanding that he was to be transported to and from the work.

 The verdict holder is entitled to the benefit of all reasonable inferences which support his verdict, and the appellate court, if its opinion undertakes to recite the circumstances which govern its decision, should set forth all those facts which support such verdict. Due, no doubt, to our lack of perspicaciousness and peripheral comprehension, we did not understand that appellants were contending that there was a separate or different arrangement, or lack of arrangement, in respect to Larry Jones than that in respect to the crew or group of boys; but since we *now* understand that to be the contention, we set forth in full (above) the only testimony we find which bears upon it in order that appellants may not feel that material evidence

and a material contention have been overlooked or ignored.

■ Assuming that all the inferences above set forth can be indulged, including the suggested inference of some separate arrangement, or lack of arrangement or understanding, we think it makes no difference in the ultimate outcome; for if there was a separate "lack of arrangement" it was abandoned by both parties when Turnage *did* proffer the transportation to work along with the rest of the crew, and the youth accepted it. The circumstances necessarily implied an understanding, or implied agreement, that Jones was to receive transportation back home.

The motion for rehearing or in the alternative to transfer is overruled.